IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:08CR148 |
| | ) | |
| v. | ) | |
| | ) | |
| HAIDER ALYASS, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

On October 18, 2010, Haider Alyass (Alyass) filed his § 2255 motion. (Filing no. 86.) He also sought leave to proceed in forma pauperis. (Filing no. 87.) After initial review[1], the defendant will be given leave to proceed in forma pauperis, but his § 2255 motion will be denied.

## *I. BACKGROUND*

I first examine the procedural history of this case. After that, I provide a review of the evidence adduced at trial.

---

[1] Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

*Procedural History*

The April 24, 2008 indictment asserted that "[f]rom an unknown date but at least as early as February 1, 2007, through April, 2008," Alyass conspired to distribute and possessed with the intent to distribute 500 grams or more of methamphetamine. (Filing no. 1.) By appointment, Alyass was represented by Mary Gryva, an experienced criminal defense lawyer.

This case was originally assigned to Judge Bataillon. Judge Bataillon started a jury trial in this case, but sustained a mistrial motion by Ms. Gryva. (Filing no. 30 (text entry).) After that, the case was reassigned to me. (Filing no. 33.) As he had done before Judge Bataillon, Alyass demanded a jury trial. This time the trial proceeded apace and the jury found him guilty. (Filing no. 45 at CM/ECF p. 1.)

The jury also determined that he was responsible for 500 grams or more of methamphetamine. (Filing no. 45 at CM/ECF p. 2.) After I sustained one of Ms. Gryva's objections, Alyass's total offense level was set at 36, his criminal history category was V, and the custodial range under the Guidelines was 292 to 365 months in prison. (Filing no. 60.) I sentenced Alyass to 292 months in prison. (Filing no. 59.)

Alyass appealed. The Court of Appeals rejected the appeal and affirmed the conviction and sentence. *United States v. Alyass*, 569 F.3d 824 (8th Cir. 2009). The judgment of the Court of Appeals was entered on July 6, 2009. (Filing no. 77.) Ms. Gryva filed a petition for rehearing[2] with the Court of Appeals, but the petition for rehearing was denied on October 30, 2009. (Filing no. 84.) There is no evidence that Alyass filed a petition for writ of certiorari with the Supreme Court.

---

[2] The Eighth Circuit docket sheet reflects that the petition was filed within the time allotted by the Court of Appeals.

Alyass filed his § 2255 motion in this court on October 18, 2010. (Filing no. 86.) Inasmuch as Alyass did not file a petition for writ of certiorari, the statute of limitations began to run 90 days after the Court of Appeals denied the petition for rehearing on October 30, 2009. *See Clay v. United States*, 537 U.S. 522, 532 (2003) ("[F]or federal criminal defendants who do not file a petition for certiorari . . . on direct review, § 2255's one-year statute of limitations period starts to run when the time for seeking such review expires."); Sup. Ct. R. 13.3 (2010) ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice). *But if a petition for rehearing is timely filed in the lower court by any party*, or if the lower court appropriately entertains an untimely petition for rehearing or sua sponte considers rehearing, *the time to file the petition for a writ of certiorari for all parties* (whether or not they requested rehearing or joined in the petition for rehearing) *runs from the date of the denial of rehearing* or, if rehearing is granted, the subsequent entry of judgment."). Therefore, Alyass's 2255 motion filed on October 18, 2010 was within the time allowed by law. *See* 28 U.S.C. § 2255(f) (providing for a 1-year statute of limitations).

Alyass makes four claims. Summarized and condensed, they are:

> 1.      Counsel was ineffective for a long list of reasons including her failure to investigate; her failure to prepare for trial; her failure to use the discovery materials to impeach the witnesses; her failure to request the appointment of an expert witness to testify about the impact of drug addiction on the witnesses; her failure to adequately cross-examine the government witnesses; her failure to frame an adequate defense; her failure to highlight the existence of a prior conspiracy; her failure to expose inconsistencies in the testimony of the government witnesses; her failure to object to Rule 404(b) evidence; and her failure to procure an Arabic interpreter to assist in communicating with the defendant.
>
> 2.      The government circumvented Rule 404(b).

    3.    The government's witnesses perjured themselves.

    4.    The evidence was insufficient to support the conviction.

(Filing no. 86 at CM/ECF pp. 4-8.)

*Trial*

The evidence against Alyass was overwhelming. On direct appeal, the Court of Appeals summarized the evidence this way:

> The government presented the testimony of two law enforcement officers, Sergeant Norman Cobb (Sergeant Cobb) and Investigator David Hanselmann (Investigator Hanselmann), and eight cooperating witnesses, Kristina Turco (Turco), Tom Hurst (Hurst), Haithem Alamiri (Alamiri), Everett Cuevas (Cuevas), Sherry Rose (Rose), Jeremiah Crosby (Crosby), Rebecca Zimbelman (Zimbelman), and Christopher Eynon (Eynon). Each witness testified to Alyass's involvement in the conspiracy.
>
> Turco testified at the trial under a nonprosecution agreement. Turco reported Alyass was her ex-boyfriend and the father of Turco's son. Turco stated she had been using methamphetamine from another supplier when she met Alyass, and she began receiving her methamphetamine from Alyass in late 2004 or early 2005. Turco explained, as a former methamphetamine seller, she taught Alyass where to get methamphetamine, how much it cost, and how to weigh it.
>
> According to Turco, in November 2006, Alyass moved to Lincoln, Nebraska, where he lived with an individual named Kadhem Albumohamed. Alyass began leaving methamphetamine at Turco's residence in York, Nebraska, and people would purchase the methamphetamine from Turco. Turco said she collected the money and held it for Alyass, unless he gave her permission to use the money to pay bills. Turco dispersed approximately two ounces of methamphetamine for Alyass every week and collected $900 per ounce. The people purchasing the methamphetamine usually prearranged the quantity with

Alyass before arriving at Turco's residence. Turco affirmed this practice continued until Alyass moved to South Dakota in the late summer of 2007.

Hurst also testified at Alyass's trial pursuant to a nonprosecution agreement. Hurst lived with Alyass for two or three months in early 2006. Hurst indicated he began to work for Alyass, driving Alyass from Lincoln to York and Columbus, Nebraska, because Alyass did not have a driver's license. Hurst admitted Alyass sometimes had Hurst deliver methamphetamine to people.

Alamiri testified pursuant to a federal cooperating plea agreement. Alamiri and Alyass first met in Saudi Arabia, and the two became good friends. Alamiri stated he began to obtain methamphetamine from Alyass in 2006. Alamiri moved in with Alyass, and Alamiri began delivering drugs for Alyass to York. Alamiri explained Alyass traveled with him to deliver drugs, and Alamiri carried the drugs in his pocket. Alamiri stated he handed the drugs to the buyers, and Alyass kept the money. Alamiri and Alyass worked together for approximately one year. Alamiri said Alyass permitted Alamiri to live with him, and Alyass let Alamiri take methamphetamine from the drug deals in exchange for helping Alyass deliver drugs.

Cuevas, the boyfriend of Turco's mother, also testified pursuant to a nonprosecution agreement. Cuevas began to sell methamphetamine in 2006 to earn money to support his own methamphetamine addiction. Cuevas purchased the methamphetamine from Alyass. Cuevas explained he would call Alyass when he wanted methamphetamine, and either Alyass, Hurst, or Alamiri would bring him the drugs in exchange for money. Cuevas paid between $1,100 and $1,400 per ounce of methamphetamine. Cuevas bought an ounce of methamphetamine every week for a period of about three months.

Cuevas contacted law enforcement officers in July 2007 "[b]ecause the drugs [were] destroying [his] life." Cuevas had two interviews with Investigator Hanselmann, and Cuevas agreed to record a telephone call to Alyass. In the call to Alyass, Cuevas did not ask for

methamphetamine, but Alyass knew what quantity of methamphetamine Cuevas would want because the quantity was always the same. The transaction was never completed.

Rose agreed to testify against Alyass under a nonprosecution agreement with the government. Rose reported she met Alyass through a mutual friend in January 2007. The following month, Rose began to purchase methamphetamine from Alyass. Rose would call Alyass, and either Alyass, Hurst, or Alamiri would deliver the drugs to Rose, or Rose would pick them up from Alyass in Lincoln. Initially, Rose purchased approximately one "teener" (1.75 grams) every one to two weeks, but later she was purchasing an "eight ball" (3.5 grams) once or twice a week. Rose purchased methamphetamine from Alyass for a period of approximately three months.

Crosby testified pursuant to an agreement with the York County Attorney's Office. Crosby stated he had known Alyass for approximately four years, and in November 2006, Crosby began to purchase methamphetamine from Alyass to sell. Crosby purchased the methamphetamine on a front, and Alyass gave him a three-day grace period in which to pay Alyass for the drugs. Crosby obtained the drugs by calling Alyass, and Crosby either picked the drugs up from Alyass in Lincoln or from Turco in York, or the drugs were delivered to Crosby in York. Crosby said he started out buying one eight ball of methamphetamine at a time, but later he was buying two or three eight balls at a time, and admitted a few times he may have bought four eight balls at once. Crosby estimated he exclusively bought drugs from Alyass over a period of four to six months.

Zimbelman also testified pursuant to an agreement with the York County Attorney's Office. Zimbelman met Alyass in March 2007, and she and her boyfriend, Eynon, began to purchase methamphetamine from Alyass. Zimbelman stated she bought one half ounce of methamphetamine from Alyass every week until January 2008, and Alyass delivered the methamphetamine to Zimbelman's and Eynon's residence every Friday.

Like Zimbelman, Eynon testified pursuant to an agreement with the York County Attorney's Office. Eynon first met Alyass at the end of 2006. Two or three weeks later, Eynon began to purchase methamphetamine from Alyass. Alyass generally would deliver the drugs from Lincoln to York, but occasionally Eynon would pick the drugs up in Lincoln. Eynon stated he typically purchased one half ounce of methamphetamine once or twice a week to sell to Eynon's coworkers. Eynon discontinued buying from Alyass around May 2007 after Eynon was arrested for driving under the influence of methamphetamine, lost his job, and was no longer able to sell methamphetamine at his workplace.

Sergeant Cobb, an officer with the York Police Department, and Crime Stopper program coordinator, reported he received drug-related information concerning Alyass from the Crime Stopper telephone tip line on March 22, 2007. Sergeant Cobb forwarded the Crime Stopper report to Investigator Hanselmann of the Nebraska State Patrol.

Investigator Hanselmann is assigned to the Rural Apprehension Program, a drug task force serving ten counties in rural southeast Nebraska. Investigator Hanselmann interviewed Hurst in connection with the Crime Stopper report. At that time, Hurst provided Investigator Hanselmann with a telephone number, and Investigator Hanselmann requested toll information on the telephone number. The toll information for the telephone number revealed a list of calls that were made to and from the number in the previous two month period. Calls were made to and from Hurst, Turco, Alamiri, Rose, Zimbelman, Crosby, and Cuevas.

Investigator Hanselmann interviewed Crosby, and Crosby was then used as an informant to attempt to make undercover drug purchases. As part of the investigation, Investigator Hanselmann located Alyass's vehicle and obtained a court order, allowing law enforcement to place a GPS tracker device on the vehicle. Investigator Hanselmann indicated the vehicle traveled to the residences of Rose, Zimbelman, Cuevas, and Eynon. Investigator Hanselmann interviewed Cuevas, and then recorded a conversation between Cuevas and Alyass.

>In October 2007, Alyass contacted Sergeant Cobb, asking to meet with him. Alyass provided Sergeant Cobb with a list of individuals who were involved in methamphetamine sales, including Turco, Rose, Cuevas, and others. Sergeant Cobb testified Alyass denied involvement in the methamphetamine distribution other than to refer people to a drug source.
>
>In November 2007, Alyass contacted Investigator Hanselmann, and the two met in Lincoln. Alyass talked about people selling and using drugs in York County, Nebraska, and identified individuals in photographs who were involved in methamphetamine sales in York, including Rose, Cuevas, Turco, Eynon, Zimbelman, Alamiri, Hurst, Crosby, and others. Investigator Hanselmann stated Alyass also discussed the amount of money the individuals paid for the drugs and from whom they purchased the drugs. Investigator Hanselmann asked Alyass "if it would surprise [Alyass] . . . people [were] telling [Investigator Hanselmann] that they get their drugs from [Alyass]." Investigator Hanselmann reported Alyass said, "people can say what they want." Alyass agreed to continue cooperating with law enforcement, but no further meetings were set up.

*Alyass*, 569 F.3d at 825-827.

## II. ANALYSIS

Generally speaking, it plainly appears from the motion, attached exhibits, and the record of prior proceedings that Alyass is not entitled to relief. Briefly, I next explain why that is so for each of the four claims.

*Claim One–Ineffective Assistance of Counsel*

In order to prevail on a claim that defense counsel rendered ineffective assistance of counsel, the claimant must establish two things. The moving party must establish (1) that "'counsel's representation fell below an objective standard of

reasonableness,'"[3] *and* (2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[4] *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) quoting (*Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).)

An evidentiary hearing is unnecessary if the claimant makes an insufficient preliminary showing on either or both prongs *or* the record clearly contradicts the claimant's showing on either or both prongs. *Engelen v. United States,* 68 F.3d 238, 240 (8th Cir. 1995) affirming denial of § 2255 motion without a hearing in the face of an ineffective assistance of counsel claim; stating that no evidentiary hearing is required where "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.").

Most of Alyass's gripes are of the "arm chair quarterback" variety and they therefore fail to show that counsel's performance was deficient. Others are based upon a misunderstanding of the law, amount to unsupported conjecture or

---

[3] A judge's "scrutiny of counsel's performance must be highly deferential" and the judge must "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Reed v. United States*, 106 F.3d 231, 236 (8th Cir. 1997). In other words, a judge should make "every effort" to "eliminate the distorting effects of hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error. *Strickland*, 466 U.S. at 690.

[4] A "reasonable probability" is less than "more likely than not," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), but it is more than a possibility. *White v. Roper*, 416 F.3d 728, 732 (8th Cir.2005). It must be compelling enough to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

conclusively proven wrong by the record. Additionally, all of the complaints fail because there is no showing of prejudice. By way of illustration, consider the following:

* The great bulk of Alyass's "ineffective assistance of counsel" argument consists of a tedious dissection of portions of the trial transcript or witness statements in an effort to show how counsel *might* have pursued different or additional lines of attack regarding the cooperating witnesses or the government's case more generally. (Filing 89 at CM/ECF pp. 2-49.) Alyass spends the bulk of his overlong brief engaging in the type of "hindsight" argumentation that the Supreme Court has counseled against. On the other hand, it is apparent from the record that defense counsel performed as required under the Sixth Amendment. For example, and consistent with her cross-examination of the cooperating witnesses, defense counsel made sure that the jury instructions emphasized that drug abuse by cooperating witnesses should be used to assess the credibility of the witnesses' testimony (filing no. 44 at CM/ECF p. 7 & Instruction No. 6) and that the testimony of cooperating witnesses should be assessed by the jury "with greater caution and care than that of an ordinary witness." (Filing no. 44 at CM/ECF p. 8 & Instruction No. 7.) Furthermore, counsel moved to dismiss on the basis of insufficiency of evidence and proof of multiple conspiracies rather than the charged conspiracy. (Filing no. 69 at CM/ECF p. 106.) Counsel was also partially successful at sentencing when one of her objections was sustained regarding role in the offense and that surely resulted in Alyass serving less time in prison. (Filing no. 71 at CM/ECF p. 3.) In sum, defense counsel's performance at trial was consistent with my prior experience with her. That is, counsel's representation was workmanlike. Finally, even if one assumes that counsel should have proceeded exactly like Alyass suggests, there is not the slightest

reason to think that things would have been different given the overwhelming evidence against him.[5]

\*      The claim that defense counsel should have hired an Arabic interpreter to assist her in communicating with Alyass is absurd. The trial evidence established that Alyass approached the government, during the alleged conspiracy, in an effort to divert attention from himself and ingratiate himself with law enforcement, while seeming to offer "tips" about the criminal behavior of the other coconspirators. He spoke to two different investigators in English and they had no communications difficulties. (Filing no. 68 at CM/ECF pp. 7-15  (Officer Cobb); filing no. 68 at CM/ECF pp. 16-34 (Investigator Hanselmann). Indeed, Alyass was sufficiently skilled in the nuances of the English language to use the words "hook up" when describing how he had come to know what he knew. While denying that he sold drugs, Alyass admitted that he arranged drug deals between many of the coconspirators; that is, "he hooked them up with someone who would sell them drugs." (Filing no. 68 at CM/ECF p. 11 &  p. 14.) If Alyass was proficient enough to use English slang when speaking with law enforcement agents about arranging drug deals, he was proficient enough in the English language to speak intelligently with his lawyer.

\*      Alyass complains that his counsel was ineffective for not objecting to what he calls improper Rule 404(b) evidence. He complains about testimony regarding illegal activity occurring in late 2004, 2005 and 2006 that predated the specific time frame set out in the indictment. However, Alyass fails to mention that

---

[5]Alyass asserts that his case is "unique" because the government primarily relied upon cooperating witnesses. (E.g, filing no. 89 at CM/ECF pp. 51-52.) ("[T]his case [is] qualified to bear the label 'unique' . . . .") However, it has long been the law that "jury verdicts may be based *solely* on the testimony of conspirators and cooperating witnesses[.]" *United States v. Jones*, 559 F.3d 831, 835 (8th Cir. 2009) (affirming drug conspiracy conviction) (citations omitted) (emphasis added).

-11-

the indictment in this case charged that "[*f]rom an unknown date but at least as early as* February 1, 2007 . . . ." the illegal activity occurred and he fails to mention that all of the evidence presented to the jury took place before the statute of limitations would have run. Thus, evidence of conspiratorial acts that occurred prior to February 1, 2007, was either admissible as (1) direct evidence of the conspiracy or (2) as historical information about how the conspirators came to deal with each other at some later time. *See*, *e.g.*, *United States v. Summers*, 137 F.3d 597, 601-602 (8th Cir. 1998) (holding that even if some of the government's evidence of a drug conspiracy occurred prior to the "on or about November 4, 1994" starting date alleged in the indictment, there would no fatal variance between the indictment and the proof if the acts took place before the statute of limitations ran; holding that some of the evidence occurring prior to the starting date of the indictment was "merely background evidence which tended to show how the conspiracy developed in its initial stages"; and holding that there was no violation of Rule 404(b) because the challenged evidence was evidence "'of the crime itself' . . . which does not come within Rule 404(b)'s coverage at all.") In short, counsel did not engage in malpractice by failing to object on Rule 404(b) grounds because Rule 404(b) did not apply. That said, even assuming that counsel's performance was deficient, there is no prejudice. The evidence presented by the government that clearly fell within the time frame alleged in the indictment overwhelming established the defendant's guilt.

*Claim Two–Rule 404(b)*

Alyass claims that the government violated Rule 404(b). This is similar to the claim he makes against his lawyer for failing to object to the improper admission of Rule 404(b) evidence. Just as I rejected that claim, I reject this one. As shown above, Alyass misunderstands the law. The evidence he complains about was not Rule 404(b) evidence. In any event, if there was error, it was not prejudicial when viewed in light of all the other evidence.

*Claim Three–Cooperating Witness Perjury*

Aside from "flyspecking" the trial transcripts and witness statements to point out possible inconsistencies, there is no showing of perjury and accordingly this claim fails. Moreover, even if there was perjury, there is no showing that the government knew (or should have known) that the witnesses were lying. *See, e.g.*, *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007) (reversing order for new trial; holding that defendant failed to establish that government knew its cooperating witness would offer perjured testimony at trial in cocaine conspiracy prosecution, as required to establish a due process violation based on prosecutorial use of false testimony; government knew that witness had told a different story at pre-trial hearing but did not know if second story was untrue, defense counsel knew at least as much as government about witness's prior inconsistent statements, defendant did not object to witness testifying at trial, jury was fully informed of witness's previous statements, and witness was subject to cross-examination).

*Claim Four–Insufficiency of Evidence*

Alyass's claim that the evidence was insufficient is both ludicrous and barred from consideration in this section 2255 proceeding because that claim was raised on direct appeal[6] and was denied. *See, e.g.*, *Dall v. United States*, 957 F.2d 571, 572 (8th Cir.1992) ("Claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255.") (citations and internal marks omitted)).

---

[6] "We also reject Alyass's argument that there was insufficient evidence supporting his conviction . . . ." *Alyass*, 569 F.3d at 828.

-13-

IT IS ORDERED that the Motion for Leave to Proceed in Forma Pauperis (filing no. 87) is granted, but the Motion Under 28 U.S.C. § 2255 (filing no. 86) is denied with prejudice. A separate judgment will be issued.

October 26, 2010

BY THE COURT:

*Richard G. Kopf*
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.